PAUL PETERSON *vs.* THE AMERICAN SCHOONER ROBERT LEWERS.

January 27, 1908.

*Admiralty—Subordinate officer—Disrating—Displacing:* A subordinate officer of a ship, if unfit for his position through incompetence or negligence, may be displaced by the master but not disrated.

*Same—Same—Same—Damages:* A second mate was disrated to the position of a common seaman and sent to the forecastle. *Held,* this to be an aggravation of damages if there was insufficient ground for displacing him.

*In Admiralty:* Libel *in rem* for wages and damages for disrating.

*Geo. A. Davis, E. A. C. Long,* and *S. F. Chillingworth,* Proctors for Libelant.

*Castle & Wilhinglon* and *W. A. Greenwell,* Proctors for Libellee.

DOLE, J. This is a libel for damages, in which the libelant

alleges that he, being second mate of the libellee, was wrongfully disrated and reduced to the standing of a common seaman on the voyage of the libellee from Port Gamble, in the State of Washington, to Honolulu; such damages being claimed as follows: $750 for the humiliation, shame and disgrace to which he was subjected on board of the said vessel; $60 as one month's wages to which he claims to be entitled for failure on the part of the libellee to have previously notified him of such discharge; and $50 for passage money for the return of libelant to the place where he shipped on board the said vessel.

It is established that the libelant shipped on the libellee on the 14th day of September, 1907, for a voyage to San Francisco, to Honolulu and such other ports in the Hawaiian Islands as the master may direct, to Puget Sound and back to San Francisco, for a term not exceeding six months, at $60 a month wages as second mate. On the 6th day of October, between six and seven o'clock in the morning, while the libellee was off the Island of Oahu, during libelant's watch, the master came on deck and after a few words with him ordered him to take his things and go forward among the sailors and perform the duties of a common sailor; on the next day, upon reaching port, the libelant left the ship and was later discharged by the shipping commissioner at Honolulu, his wages as second mate being paid up to that date; in connection with such discharge the libelant and the master signed, with other members of the crew, discharged at that time, the following release written in the "mutual release book":

We the undersigned on board the schooner Robert Lewers on her late voyage from San Francisco do hereby each one for himself by our signatures herewith given, in consideration of settlements made before the shipping master at this port, release the master and owners of said vessel from all claims for wages in respect of the said past voyage or engagement. And I, master of said vessel, do also release each of the seamen signing said release of all such claims, in consideration of this release signed by them.

Master's Name.

   E. R. Underwood

| Date | Seaman's Name | Station | Wages | Am't Rec'd |
|------|---------------|---------|-------|-----------|
| Oct. 6th | Paul Peterson | 2nd mate | $105. | $50. |
| | Protest | | | |
| Oct. 11th | W. Hubscher | A B | 40.45 | 40.50 |
| Oct. 14th | Jam. Long | Cook | 180. | 180. |

This is a receipt and a discharge of all claims for wages in respect of the past voyage or the engagement. The engagement covers the agreement set forth in the shipping articles, and although a seaman is not always bound by such a release, yet in this case I see no reason for modifying or refusing to recognize this release according to its terms. The claim, therefore, for any further wages on account of the alleged disrating is disallowed.

It is recognized maritime law that a master has full authority for good reasons, of which the court is the final judge, to disrate any seaman and displace any subordinate officer. It is not very clear from the authorities as to the status of an officer upon being disrated. An AB sailor, upon being disrated, may be placed on any inferior footing and required to do the work at wages belonging to such position. It is not clear that a mate may be compelled to work as a seaman upon being disrated. The general rule is that a seaman who is disrated is entitled to his discharge at the next port. 25 Am. & Eng. Encl. Law, (2nd ed.) 130; *The Mary C. Conery,* 9 Fed. Rep. 222; *The Hotspur,* 3 Sawyer, 194: Fed. Case No. 6,720.

The prevailing federal rule seems to be that a mate, upon being deprived of his authority, is displaced rather than disrated, and should be treated well for the rest of the voyage to the next port and is in the position of a *quasi* passenger and is not required to go forward and do sailors' work.

The court in the case of *United States v. Savage,* 27 Fed. Cases (No. 16,225), 966, says:

" He [referring to the first mate] is not indeed to be treated in a harsh or disgraceful manner; he is to have suitable food and lodging and conveniences assigned to him by the master. \* \* \*  Being no longer in office, he is to be deemed a *quasi* passenger."

And the court in *Atkyns v. Burrows,* 2 Fed. Cases (No. 618) 115, says:

" The mate [evidently the first mate in this case] tendered himself ready to perform his duty as mate but the master refused to receive him in that capacity.  He was not bound to act in any other station."

Adopting this ruling as regards a second mate as well as a first mate, I find that the action of the master in compelling libelant to take his things from the cabin and go forward among the crew and do the work of a common sailor, is treatment calling for consideration on the question of the amount of damages, if the displacement was not justified.

On the question of justification, there is evidence by the master and the first mate and C. O. Hansen, a member of the crew, who was promoted to libelant's place as second mate; also three seamen on libelant's watch.  It is a curious feature of this case that both the master and the first mate, who are hostile witnesses, had made no complaint of the work of the libelant, had in no instance found fault with him or cautioned him, or talked with him to show that his work was unsatisfactory and they desired some improvement in his conduct, until the day before the vessel arrived in port on the part of the master, and the day before that day on the part of the mate.  The master says in his testimony that between six and seven he came on deck and libelant was sitting down by the rail pulling a rope, hand yarn apparently, taking no notice of anything,—" I went up and asked him if he came aboard the vessel to work, or if he didn't."

Q.  " What did he say ? "

A.  " He answered in an evasive manner."

Q.   " What did he say ? "

A.   " 'Aint I working ?' "

Q.   " What did you say ? "

A.   " 'That is not the question; I am asking you did you come aboard to work, or did you not ? ' ' Haven't I done my work ? ' ' That is not the question, but did you come here to work or didn't you ?' Then he answered nothing. I simply made the statement ' If you don't want to go to work you can go forward.' He said, ' I will go forward.' " (Trans. p. 56.)

Wester, the first mate, testified,—referring to the day before,—at 4 p. m. he came on deck and went to sit down on the spar abreast of the galley, "and one of the sailors went up in the rigging without anything being told, I was standing by the mainmast, and the other sailor didn't come out at all, so I asked the second mate, I says, ' What's the matter with you, are you dead, or what's wrong with you, you don't seem to take care whether the sailors work or not?' So we had a few words there together, and then I got mad and went aft." (Trans. p. 79.) The mate also testified that when libelant came aboard the first night out he didn't put anything down in the log. There was other testimony as to his inefficiency—the captain criticising libelant in regard to shifting the topsails on the first night out when they were in danger of colliding with another ship, in that it took him too long a time; and general criticism of his work as being not up to requirements, requiring more vigilance on the part of the master; not keeping the sails trimmed to the wind without being told to do so, not keeping his watch working and other matters more or less trivial. The three witnesses in the libelant's watch all testify that libelant attended to his duties according to the practice of second mates in the ships that they had been to sea in, and they were all veteran sailors,—and the weight of Hansen's testimony, who was called on behalf of libellee, and was in a somewhat delicate position from having been promoted to the vacant position caused by the disrating of libelant, was favorable to libelant. Libelant's testimony as to the conversation between the master

and himself at the time he was ordered forward, is as follows:

"The captain came up in the morning about half past six, and I had put the men to work, and as soon as he comes up to me, he walks up to me, standing on the deck-load, and he says 'Will you go to work?' I says, I got surprised, rather, I says 'Haven't I been working?' He says 'Yes, but go to work now.' 'Well,' I says, 'what do you want me to do?' 'Well,' he says, 'take your traps and go forward if you don't want to go to work.' I said 'All right, sir, I will do as you say.' I packed up my clothes and went forward." (Trans. p. 5.)

According to the entry in the log made by the master, referring to this occurrence, the master had started out to have it out with him, as he says, that he could not stand any more of his lazy, shiftless ways, so gave him his choice to either go to work or go forward with the men.

This conversation between the master and libelant at the time when he disrated him has nothing in it significant of any serious want of respect toward the captain on the part of the libelant, and there was no refusal to work. Libelant, according to his own story, had nothing particular to do beyond matters pertaining to the navigation of the ship. As he says, the work of cleaning, scraping and painting the ship had been finished and she "looked as a yacht," and without refusing to work, he inquired of the captain what work he wished him to take up; the captain was either unwilling or unable to give him any suggestion as to that. Although there is evidence in this conversation of some verbal sparring between the master and the libelant, yet there is nothing in it to justify the action of the master. The master's evidence as to the conduct of the libelant during the voyage is not borne out by the evidence of four of the witnesses, one of whom was a witness for the libellee. Moreover, the libelant produced a license as second mate on steam vessels for the term of five years from February, 1903, and testified to having served as mate on a number of sailing vessels, in three of them as first mate; in steamers as second mate; that he never had any trouble with the master on any of these ves-

sels. With this license, and his testimony,—taking it even with some allowance, and the favorable testimony of the four sailors, it is improbable that the story of the captain and the first mate as to his inefficiency and negligence is correct. The master went so far as to say that he had not performed his duties at all. In view of all the circumstances, I feel that their evidence is somewhat exaggerated. It is difficult to understand, if their testimony is true, why they should not have expostulated with the libelant during the voyage, calling his attention to his failure of duty and with some exercise of patience and interest have made an attempt at least to have brought him up to their requirements; but nothing of that kind was done. The manner of the master toward him on the morning of the 6th of October has all the appearance of insolence. No occasion appears in the evidence why the master of the ship at that time should have started out to pick a quarrel with this subordinate officer, using his superior authority to snub him and put him at a disadvantage, to refuse to give him any hint as to what he required or what work he should attend to, and then to disrate him to the position of a common seaman. It is not to be presumed that libelant was an ideal mariner, few such are met with; but that he was so deficient that the disrating was justifiable does not appear in this case.

In the case of *Thompson v. Busch,* 23 Fed. Cases (No. 13,944) 1024, in which the mate was displaced and returned to the United States on the ship as a passenger, the court goes fully into a case of displacing, and although the evidence in that case showed disloyalty, disrespect, almost conspiracy on the part of the mate against the master, but not disobedience in relation to the navigation of the ship, yet the action of the lower court in sustaining the mate against the action of the master in displacing him, was confirmed, the court adopting the rule laid down in the case of *Atkyns v. Burrows,* supra, in which it was decided that such an officer " may forfeit his right to command and wages, by fraudulent, unfaithful, and illegal practices; by gross and repeated negligence; by incapacity,

brought on him by his own fault, to perform his duty, or palpable want of skill in his profession."

None of these faults are made out by the testimony in this case. The libelant, with a long record of service as first and second mate, with a license from authority as second mate on steamships, has been grossly humiliated before his crew and has been damaged in his reputation so that wherever such disrating is known, it will tend to make it difficult for him to obtain such engagements as his license entitles him to. The action of the master in sending him to the forecastle and compelling him to do the work of the crew, adds to the damage that he has suffered.

I find that he is entitled to $50 for his return voyage to the port where he shipped, and to the sum of $500 as damages and costs, and will so decree.